UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DAVID A. ALLEN and STRATEGIC BENEFITS CONSULTANTS, INC., *Plaintiffs/Counter-Defendants*, | ) ) ) ) | |
| vs. | ) ) | 1:10-cv-0591-JMS-MJD |
| GARDNER & WHITE CORPORATION, GARDNER & WHITE INC., GW EQUITY, INC., SHAWN BOGENRIEF, and SCOTT RINGOLD. *Defendants/Counter-Plaintiffs*. | ) ) ) ) ) ) ) | |

## **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendants/Counter-plaintiffs' Motion For Summary Judgment. (Dkt. #121). Through joint stipulations of dismissal and the abandonment of issues during the briefing of the motion, Plaintiff/Counter-defendant David Allen's only claim remaining for purposes of the summary judgment motion is his claim of discrimination, brought pursuant to 42 U.S.C. § 1981, against Scott Ringold, individually, and Gardner & White Corporation, Gardner & White, Inc., and GW Equity Inc. (collectively hereinafter "Gardner & White").[1] The counterclaims brought by the Defendants/Counter-plaintiffs are not the subject of the motion for summary judgment. For the reasons expressed herein, the Court grants summary judgment in favor of the Defendants/Counter-plaintiffs.

### I. Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute

---

[1] Specifically, in response to the summary judgment motion, Allen abandoned his breach of contract claim against the Defendants/Counter-plaintiffs as well as all claims against Shawn Bogenrief. [Dkt. 130 at 1 n.1.]

1

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law identifies that facts are material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372 (2007).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying" those materials which "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). For purposes of deciding the motion, a court must view the facts in a light most favorable to the non-moving party. *E.E.O.C. v. AutoZone, Inc.,* 630 F.3d 635, 642 (7th Cir. 2010). However, if a party "fails to properly address another party's assertion of fact ... the court may consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

## II. Factual Background

Gardner & White is in the business of helping companies with various aspects of retirement, insurance, and employee benefit plans and services clients nationwide. Allen was hired by Gardner & White in March 2005 as a Regional Vice President ("RVP") for its Northern Illinois Territory. Allen was salaried through the end of that year, but beginning with the 2006 calendar year he became an independent contractor, signing an agreement with Gardner &

White[2] that called for him to be compensated entirely on a commission basis. He was to receive 50% of commissions received by Gardner & White on existing business and 75% of commissions on new business. He assigned his right to the commissions to Strategic Benefits Consultants, Inc. ("SBCI"), a company he created along with his wife and father-in-law for the purpose of receiving the commission income.

Beginning in November 2005, Allen reported to Defendant Scott Ringold, the Managing Director. Gardner & White's business had been going through a downturn when it hired Allen and Ringold in 2005 and, while Allen was hired to salvage and grow the business in his region, there was an expectation of some business loss from 2005 to 2006. The gross commissions in 2005 for Allen's district were $1,005,794 and the business plan he presented to Ringold in November 2005 estimated gross commissions for 2006 to be $981,796. The actual gross commissions for 2006 ended up being $837,243.

As the 2006 calendar year progressed, there were more business losses and fewer gains than either Allen or Ringold expected. Though mindful that Allen was spending much time rebuilding relationships for Gardner & White, toward the end of 2006 Ringold expressed concern to Allen about Allen's region's lack of progress. On February 9, 2007, Ringold sent Allen an email advising him that the region's goal for 2007 should be to increase gross commissions by 10% to $920,967. Allen thought the overall goal given to him was too high, but indicated to Ringold that he would commit to increasing the recurring business from $700,000 to $845,000 for the year.

In July 2007, Ringold followed up a telephone conference with Allen by writing him a

---

[2] The Regional Vice President Agreement entered into by Allen states that it is "by and between Gardner & White Corporation, an Indiana Corporation, and its affiliates Gardner & White, Inc. and G & W Equity Sales, Inc. (collectively referred to herein as 'Gardner & White') and David A. Allen ('RVP')."

summary letter discussing the erosion of business in the region subsequent to his takeover. The July 19, 2007 letter was written by Ringold after consultation with Jim Mandel and Shawn Bogenrief, who were the owners and directors of Gardner & White, with whom Allen had interviewed for his position. Ringold regularly reviewed regional sales figures with Mandel and Bogenrief. In the letter, Ringold recognized the early difficulties Allen faced when he joined the firm in 2005 and began restructuring the region, but Ringold also emphasized the ongoing reduction in sales in his region and the need for Gardner & White to see "some immediate improvement in the production from your office." He went on to write:

> Between now and the end of 2007 the owners and I are looking for significant improvement in the following areas:
>
> - Increased sales of group and individual business
> - Increased group proposal activity
> - Increased activity in promoting and quoting HEBA and Group LTCI
>
> David, at this point, I'm not going to specify exact numbers for any of these areas. Suffice to say that we are looking for significant improvement. We do not wish to enter 2008 wondering if you will ever turn this office around and achieve the revenue conservation and production goals that have been mutually agreed upon. That is why we must see some progress in the next six months.

Ringold closed the letter by indicating that they would review Allen's progress at the end of the third quarter.

On August 21, 2007, Allen had dinner with Ringold and Bogenreif. A comment at that dinner fuels Allen's claim of discrimination. Allen maintains that Ringold used a racial slur during the course of dinner, and he described the surrounding circumstances during his deposition:

> Q: Now, tell me about the alleged discriminatory remark that Scott made at Weber Grill.
> A: Well, as I said, we were talking about sports and talking about athletes and, you know, people of minorities and their successes. And something – he said, well, you know – I believe the reference, as I recall, he said, you

4

> know, I'm from Kentucky, or my grandfather who's from Kentucky said he would have referred to people like that as – and he used the capital N word. And then I said back to him, you know I'm African American. And no response.
>
> Q: So he wasn't referring to you. He was referring to – he was saying what his grandfather would have called pro athletes that were African American?
> A: Correct. Not just pro athletes, I think people of that color.

There is no evidence of any other occasion when Ringold used that particular pejorative term or any other related to race.

At the close of the third quarter of 2007, Ringold sent Allen an email which summarized fiscal year results and stated:

> David, the last 24 months of gross commissions from your office look like this:
> - Oct 05 thru Sept 06: $813,204
> - Oct 06 thru Sept 07: $701,343
> - That's a loss of $111,860 or 13.8%
>
> I will be scheduling a time with you this week (along with each RVP) to review your YTD production and pipeline activity. I am looking for compelling indicators and activity that will stop the bleeding and turn this around.

During the course of 2007, Ringold learned as well from Bogenrief that SBCI was late paying bills and had bounced checks to creditors. With concerns mounting, Ringold conferred with Mandel and Bogenrief regarding the continued problems with the sales numbers from Allen's region and whether he was the right person to grow that business. The three of them agreed that Allen's service as a RVP for Northern Illinois should be terminated. Though Allen's region had the worst performance of any which directly reported to Ringold, Allen was not the only Gardner & White RVP to be terminated at that time. James Annear, who headed up Gardner & White's Iowa region, also had significant sales production and retention problems and it was determined that he should also be terminated. Mr. Annear is Caucasian.

Ringold prepared a "talking points" memo to take with him and use at termination meetings he scheduled at the start of the new year. He met with Allen on January 4, 2008 in Oak Brook, Illinois and provided him with written notice of the termination of his relationship with Gardner & White, effective January 31, 2008. Using the same "talking points memo," he met with the RVP for Iowa Mr. Annear, the following day and terminated that relationship as well.

### III. Discussion

The same standard of proof applicable to claims made under Title VII of the Civil Rights Act of 1964 applies to discrimination claims brought pursuant to 42 U.S.C. § 1981. *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806 (7th Cir. 1999). A plaintiff may choose from two methods of proving a race discrimination claim, direct or indirect. The indirect method invokes the familiar *McDonnell Douglas* template of demonstrating a prima facie case by showing that the plaintiff: (1) is a member of a protected class; (2) was meeting his employer's expectations; when he (3) suffered an adverse employment action; which (4) caused him to be treated less favorably than others similarly situated who were not members of the protected class. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Allen, however, has chosen to pursue the direct method, wherein he relies on "either direct evidence that acknowledges discriminatory animus on the part of the employer or circumstantial evidence which establishes discriminatory motive through a longer chain of inferences." *Grigsby v. LaHood*, 628 F.3d 354, 358 (7th Cir. 2010) (citing *Mach v. Will County Sheriff*, 580 F.3d 495, 499 (7th Cir. 2009)). To survive at the summary judgment stage, a plaintiff relying on the "direct method" of proof, "must present 'direct or circumstantial evidence that creates a convincing mosaic of discrimination on the basis of race'." *Good v. University of Chicago Medical Center,* 673 F.3d 670, 674 (7th Cir. 2012) (quoting *Winsley v. Cook County*,

563 F.3d 598, 604 (7th Cir. 2009)).

The Seventh Circuit has recognized three types of circumstantial evidence of intentional discrimination: (1) suspicious timing, ambiguous statements, oral or written, behavior toward or comments directed at other employees in the protected groups, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) evidence that similarly-situated employees received better treatment; and (3) the employer's stated reason for the difference in treatment is unworthy of belief. *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

Allen argues that there is sufficient circumstantial evidence to allow his claim of discrimination to be heard by a jury. As his centerpiece of circumstantial evidence, Allen points to Ringold's use of the racial slur "n*****" when describing his grandfather's vernacular during the course of the August 2007 dinner with Allen and Bogenrief. Allen notes that the comment was made just five months prior to his actual termination and that one could infer that Ringold's decision to terminate him may have actually occurred as early as two months following that comment. He also argues that, while Mandel and Bogenrief's concurrence may have been ultimately necessary for Allen to be terminated, Ringold was the one who provided those two with all information and the recommendation that Allen be terminated.

Along with Ringold's use of the racial slur, Allen asks the Court to consider that Ringold and Gardner & White have provided varying reasons for his termination, including poor sales results and the financial difficulties of SBCI. He notes as well that Ringold's "talking points" memo mentions "lack of production and activity from subordinates, lack of accountability and failure to build and maintain external and internal relationships" as reasons for the decision. He suggests these alleged differences are evidence of inconsistency in the basis for his firing. In the

7

aggregate, Allen argues that there is sufficient circumstantial evidence to infer a nefarious discriminatory intent behind his termination.

The evidence Mr. Allen relies on falls far short of weaving a convincing mosaic of discrimination. Allen agrees that Ringold did not use the racial slur in reference to him or any specific individual, but was articulating that term as a derogatory reference that his grandfather would have used. While Ringold's choice to use such a pejorative word in the course of a dinner conversation may prove his ignorance to the wounds that its mere mention may open, it does not, by itself, serve to support a conclusion that Ringold held a discriminatory bias against Allen or African Americans. The context of his comment, as well as relevant authority, belies such an automatic inference of discrimination.

Seventh Circuit authority supports the Court's conclusion that the isolated remark is insufficient to establish that a decision was motivated by discriminatory animus. *See Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007). In *Hemsworth*, an employee claimed he was fired due to his age and relied on three age-related remarks made by various members of management and the fact that 84% of employees let go in a reduction in force were over 40 to prove his claim. *Id.* The comments the plaintiff offered as circumstantial evidence of age bias included: (1) a comment to the effect that laying off a large number of employees over 40 could be a problem, which was made in a conversation between human resources director and the company's general counsel; (2) a comment made after the plaintiff returned to work following a stroke that he "looked old and tired;" and (3) an age inappropriate remark made by a manager during an employee evaluation. *Id.* The Seventh Circuit affirmed the district court's grant of summary judgment to the defendant employer and held that "a particular remark can provide an inference of discrimination when the remark was (1) made by the decision maker, (2)

around the time of the decision, and (3) in reference to the adverse employment action." *Id.* (citing *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006), and *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 652-53 (7th Cir. 2000)).

While Ringold is certainly a decision maker with regard to the determination that ended Gardner & White's relationship with Allen, his insensitive remark at dinner was not made in reference to an adverse employment action and was not made near the time of the decision to terminate Allen. The uncontroverted evidence is that Ringold did not meet with Mandel and Bogenrief to discuss the possibility of terminating Allen until after Ringold's October 1st email detailing Allen's latest review of sales figures.

Of particular note as well is that Allen has not challenged the accuracy of the Gardner & White sales records for his region or Defendants' contention that he had the worst performance against goals of any RVP. Nor can he show that others who were not African American were treated better, because the day following his termination, Ringold terminated a Caucasian RVP who also had poor sales performance.

Likewise, Allen's claim that Gardner & White has given varying reasons for his termination cannot survive scrutiny. Gardner & White has consistently maintained that Allen was terminated for his poor performance. The three reasons in the "talking points" memo prepared by Ringold ("lack of production and activity from subordinates, lack of accountability and failure to build and maintain external and internal relationships") are not in conflict with the fact that Allen was terminated for poor production; rather, they address underlying reasons for poor performance. None of the three decision makers has said that the concern they had with SBCI's check bouncing was the basis for terminating Allen. It was referenced only as an additional concern, again related to poor sales, but also legitimate with respect to Gardner and

White's reputation. In the end, Allen has failed to set forth sufficient evidence for his claim to survive summary judgment.

## IV. Conclusion

For the reasons detailed herein, Defendants' Motion for Summary Judgment (Dkt. #121) is **GRANTED**. The magistrate judge is requested to convene a status conference to address whether Defendants/Counter-plaintiffs intend to proceed on their counterclaims and whether the current case management plan is workable.

05/01/2012

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Copies to:**

Amy Joan Adolay
KRIEG DEVAULT LLP
aadolay@kdlegal.com

Deborah Bourne Allen
dballen@strategicbenefitsconsult.com

Andrew Dutkanych III
BIESECKER DUTKANYCH & MACER LLC
ad@bdlegal.com

Elizabeth Gardner Russell
KRIEG DEVAULT LLP
erussell@kdlegal.com